[No. G020955. Fourth Dist., Div. Three. Jan. 20, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT MILEN YOVANOV, Defendant and Appellant.

## COUNSEL

David Joseph Macher, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## SONENSHINE, J.—

### INTRODUCTION

The evidence in this case showed Robert Milen Yovanov sexually molested his girlfriend's twin daughters, Kristy and Kathy H., at various times throughout their childhood. The first rash of molestations occurred in 1986, when the girls were 11 years old. Yovanov was sent to prison for his conduct, but he was paroled in May 1988 and thereafter resumed molesting Kristy. In 1989, Yovanov was arrested for violating parole and sent back to prison for eight months. Upon release, he again molested the twins, primarily victimizing Kathy.

The twins reported Yovanov to the police in 1994, and less than one year later he was charged with thirty-six counts of committing a lewd act on a child. (Pen. Code, § 288, subd. (a).)[1] The charges were based on his molesting Kristy from the time he was initially released from prison until the time he was arrested on the parole violation. The jury convicted on all counts, and Yovanov was sentenced to 78 years in prison.

On appeal, Yovanov contends (1) the prosecution was time-barred, (2) the court erroneously allowed evidence of Yovanov's uncharged sexual misconduct, (3) the court failed to give a timely limiting instruction on the

---

[1] Unless noted otherwise all further statutory references are to the Penal Code.

permissible use of evidence regarding child sexual abuse accommodation syndrome, (4) the prosecutor committed misconduct by misstating the law and the evidence and (5) cumulative error requires reversal. We affirm the judgment in its totality.

I

FACTS

Kristy and Kathy were born identical twins on May 17, 1975. When they were 11 years old, Yovanov moved into their Anaheim house as their mother Terry's new boyfriend. One night, Yovanov got the twins drunk on champagne and visited their bedroom after they passed out. Kristy awoke to find Yovanov on top of her, rubbing his penis on the outside of her vagina. Yovanov also touched Kristy's vagina with his hand and mouth and grabbed her breasts.

Yovanov then went over to Kathy's bed and put his mouth on and manually probed her vagina. Kathy pretended she was sleeping during the 30-minute ordeal. After Yovanov left, she asked Kristy, "Did he do it to you?" Kristy replied yes.

The girls told Terry about the incident, and she promised to "take care of it." However, the molestation continued unabated, and the girls came to think Terry did not believe their claims. At one point, Kristy also told her stepbrother about the molestation.

Yovanov molested the twins regularly over the next several months. During these episodes, Yovanov did "everything you could do sexually [to Kathy] without having intercourse."[2] On one occasion, Yovanov digitally penetrated her vagina so hard, her eyes began to water. When Kathy did not verbally respond, Yovanov pulled her hair and asked her if it felt good.

Yovanov committed equally egregious acts against Kristy. Often when he molested her, Yovanov would masturbate while having her touch his penis. After he ejaculated, he would wipe his semen on the floor under her bed. Yovanov also exposed Kristy to pornographic magazines.

Yovanov told the girls sex was their "special secret" and it would cause problems if they told anyone about it. Nonetheless, the girls did protest to Terry about the molestation, and Yovanov was eventually charged with multiple counts of committing lewd acts with the girls. On May 21, 1987,

---

[2]Yovanov tried having sexual intercourse with Kathy, but he was unsuccessful.

Yovanov pleaded guilty to 13 counts and was sentenced to prison. While Yovanov was serving his sentence, Terry visited him regularly, even bringing the girls to see him sometimes.

In May of 1988, when the girls were 13 years old, Yovanov was paroled on condition he maintain his own residence and not have unsupervised visits with the girls. Yovanov took up residence in his own apartment for awhile, but soon moved in with Terry and the girls in their new home in Fullerton. It was not long after Yovanov made his way back into the girls' lives that he resumed his lewd behavior.

The molestation started one evening after Kristy fell asleep on the floor while watching a movie. When she awoke, Yovanov was rubbing her back, breasts and crotch. After that episode, the molestation was "basically on again," with Yovanov doing "a lot more" and "a lot worse" things to Kristy than he did before, including having sexual intercourse with her. Typically, Yovanov would molest Kristy after she went to bed at night and in the morning after Terry went to work. This occurred up to six days a week throughout 1988. Sometimes Yovanov would use a vibrator on Kristy, and once he invited her to peek into his bedroom and watch him and Terry having sex.

Kristy told Yovanov she did not like being molested, but he did not seem to care. He told her he would never go back to prison and there was nothing she could do to put him there. Kristy suspected Terry knew about the molestation, but Terry never did anything about it. Eventually, Yovanov's parole officer discovered he was back with the girls, and on January 26, 1989, Yovanov was arrested for violating parole.

On that day, Yovanov engaged in his usual routine of molesting Kristy in the morning after Terry departed. Upon leaving the house for work, Yovanov was arrested and taken back inside. When the arresting officer informed Yovanov he was violating parole by being alone with the twins, he glibly replied, "That was just the breaks." When Yovanov saw Kristy in the living room, he told her, "Now be good to your mom. Don't cause her any trouble."

Later, when the arresting officer asked Kristy if Yovanov had been molesting her, she said no because she did not want to be placed in protective custody, as she had been the first time Yovanov was arrested. During the questioning, Kristy seemed frightened and uncomfortable. When asked if she would ever tell if Yovanov was molesting her, she replied no. Later, the police searched the apartment Yovanov had been renting (but not

living at) and found various pornographic magazines, including some with articles about incest.

Yovanov was imprisoned on the parole violation until September 1989. Upon release, he soon began staying overnight with Terry and the girls. By that time, the twins were 14 years old and had obtained locks for their bedroom doors. However, Yovanov still found a way to sexually exploit them.

Claiming her skin was dry, Yovanov would rub baby oil all over Kathy's body after tucking her into bed. He also would put his hand in Kathy's crotch and encourage her to take off her underwear. Whenever Kathy protested, Yovanov would apologize. However, after a few days, he would return to his deviant ways.

One time, Yovanov drove Kathy and her date to a dance in a limousine. He told Kathy he wanted her and her boyfriend to have sex in the back of the car so he could watch. On other occasions, Yovanov told Kathy about different sexual positions, demonstrating them with her while they were clothed. He also advised her on how to perform oral sex. Kathy tried to tell Terry about Yovanov, but she seemed disinterested and just ignored what was going on. Kathy moved out of the house when she turned 17 years old.

Kristy did her best to avoid Yovanov during these years. But one morning while she was in high school, she fell asleep while watching television. When she awoke, Yovanov was wiggling his foot in her crotch. Kristy stormed out of the room, and Yovanov never touched her again.

Kristy and Kathy discussed Yovanov's conduct, agreeing they would eventually report him to the police. However, they wanted to wait until they were 18 years old, so Terry would not kick Kristy out of the house. True to their word, the twins reported Yovanov to the Fullerton police on January 28, 1994. Less than one year later, on January 18, 1995, a criminal complaint was filed charging Yovanov with having repeatedly molested Kristy between the time he was first released from prison (the summer of 1988) until the day he was arrested for violating parole (January 26, 1989).

In order to help explain why the twins waited so long to report Yovanov, the prosecution called Dr. Veronica Thomas, a clinical and forensic psychologist. She explained children who are molested often suffer child sexual abuse accommodation syndrome (CSAAS), which prevents them from escaping or revealing the abuse. CSAAS arises because the child feels powerless to report a perpetrator who is also providing emotional and economic

support for the family. In addition, victims often learn to accommodate the molestation by accepting it as a normal part of their life. They fear reporting the abuse will disrupt their family, and consequently they will commonly not report being abused or, at the very least, wait until they become adults to do so.

Testifying on Yovanov's behalf, Terry admitted the girls told her Yovanov was molesting them when they were 11 years old. However, when she brought it up with Yovanov, he denied any wrongdoing. Terry was shocked and upset when Yovanov was sent to prison, but she felt everything would be fine if they all went to counseling. She took the girls to visit Yovanov in prison because they wanted her to. And when he was released and began staying overnight with them, the girls appeared happy. Terry knew Yovanov was violating parole, but it did not dawn on her that there would be any problems. She spoke with the girls following the parole revocation and was satisfied Yovanov was not molesting them. After Yovanov was released for the parole violation, the girls became rebellious and threatened to report Yovanov if they did not get their way around the house. During this time, the girls told Terry that Yovanov was molesting them and they did not want him around anymore.

## II

### STATUTE OF LIMITATIONS

A. *Background*— ▇ In the trial court, Yovanov argued the prosecution was time-barred under the six-year statute of limitations generally applicable in cases involving lewd acts on a child. (See §§ 800, 288, subd. (a).)[3] The trial court rejected this argument, ruling the case was timely prosecuted under section 803, subdivision (g).

That statute provides in pertinent part, "(1) Notwithstanding any other limitation of time described in this chapter, a criminal complaint may be filed within one year of the date of a report to a California law enforcement agency by a person of any age alleging that he or she, while under the age of 18 years, was the victim of a crime described in Section . . . 288 . . . . [¶] (2) This subdivision applies only if both of the following occur: [¶] (A) The limitation period specified in Section 800 or 801 has expired. [¶] (B) The crime involved substantial sexual conduct, as described in subdivision (b) of Section 1203.066, excluding masturbation that is not mutual, and there is

---

[3]Pursuant to section 800, there is a six-year statute of limitations for offenses punishable by imprisonment for eight years or more. Section 288, subdivision (a) sets the maximum punishment for committing a lewd act on a child at eight years.

*independent evidence that clearly and convincingly corroborates the victim's allegation. No evidence may be used to corroborate the victim's allegation that otherwise would be inadmissible during trial. Independent evidence does not include the opinions of mental health professionals."* (§ 803, subd. (g) (hereafter section 803(g)).)

Yovanov alleges section 803(g) is inapt for two reasons. First, the statute's reference to the filing of the criminal complaint as the relevant act for purposes of commencing the prosecution conflicts with the guidelines set forth in section 804. And second, the prosecution failed to provide clear and convincing evidence which independently corroborated Kristy's allegations of sexual misconduct. Neither claim has merit.

B. *Commencing the Prosecution*—As set forth above, section 803(g) allows an otherwise time-barred action for sexual abuse to proceed if the prosecution files a criminal complaint within one year of the victim's allegation to the police. Because the prosecution filed the criminal complaint against Yovanov less than one year after Kristy reported him to the police, the action would be timely under the express terms of section 803(g).

Ordinarily, however, the filing of the criminal complaint is not the controlling event for ascertaining the timeliness of criminal prosecutions, at least not in felony cases. As provided in section 804, an offense is typically deemed to commence for statute of limitation purposes ". . . when any of the following occurs: [¶] (a) An indictment or information is filed. [¶] (b) A complaint is filed with an inferior court charging a public offense of which the inferior court has original trial jurisdiction. [¶] (c) A case is certified to the superior court. [¶] (d) An arrest warrant or bench warrant is issued, provided the warrant names or describes the defendant with the same degree of particularity required for an indictment, information, or complaint."

Under these criteria, Yovanov's prosecution commenced on February 26, 1996, the date the case was certified to the superior court. As this was more than one year after the twins reported Yovanov to authorities, Yovanov's prosecution would not have been timely under section 803(g). Naturally, Yovanov argues the criteria in section 804 should govern his case. However, based on well-established rules of statutory interpretation, we reject this argument.

█  The primary objective of statutory interpretation is to ascertain and effectuate legislative intent. (*People* v. *Woodhead* (1987) 43 Cal.3d 1002, 1007 [239 Cal.Rptr. 656, 741 P.2d 154].) We do so by first examining the language of the statute. (*Ibid.*) "If a statute's language is clear, then the

Legislature is presumed to have meant what it said, and the plain meaning of the language governs." (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 8 [255 Cal.Rptr. 412, 767 P.2d 679].)

Section 803(g) is clear insofar as it expressly designates the filing of the criminal complaint as the relevant event for determining when the prosecution has commenced for purposes of that section. The statute also makes clear it is an exception to the general time limitations applicable to criminal actions. Thus, the plain language of the statute strongly militates against Yovanov's proposed interpretation.

Moreover, when, as here, a particular subject matter is covered by ostensibly inconsistent provisions, one of which is special and the other general, the special provision takes precedence unless a contrary intent clearly appears. (*In re Williamson* (1954) 43 Cal.2d 651, 654 [276 P.2d 593].) Section 803(g) is the more specific statute, insofar as it applies to a narrow class of sex offenses involving a child victim and substantial sexual conduct. There is no indication the Legislature intended the general commencement of action criteria in section 804 to apply to this special category of cases. Indeed, the Legislature could hardly have been more clear in excepting such cases from the reach of section 804 by designating the filing of the criminal complaint as the pivotal event for purposes of commencing an action under section 803(g). Accordingly, we construe the statute to mean what it says. Under this plain-meaning interpretation, Yovanov's prosecution was timely commenced.

C. *Sufficiency of the Corroborative Evidence—* Yovanov also submits there was not clear and convincing evidence which independently corroborated Kristy's allegations of sexual misconduct, as required by section 803(g). We disagree.

In arguing lack of corroborative evidence, Yovanov contends the Legislature, by requiring clear and convincing evidence, intended a formidable standard of proof in cases prosecuted under section 803(g). Indeed, clear and convincing evidence denotes proof that is clear, explicit, and unequivocal and leaves no substantial doubt. (*People v. Martin* (1970) 2 Cal.3d 822, 833, fn. 14 [87 Cal.Rptr. 709, 471 P.2d 29], disapproved on another point in *People v. Chojnacky* (1973) 8 Cal.3d 759, 764 [106 Cal.Rptr. 106, 505 P.2d 530]; *People v. Caruso* (1968) 68 Cal.2d 183, 190 [65 Cal.Rptr. 336, 436 P.2d 336].) However, we disagree with Yovanov to the extent he contends the clear and convincing standard requires an admission of guilt from the defendant.

Yovanov bases this contention on the legislative history of section 803(g), as discussed in *Ream v. Superior Court* (1996) 48 Cal.App.4th 1812 [56

Cal.Rptr.2d 550]. There, the court explained section 803(g) " 'creates a new exception to the statute of limitations by allowing a person of any age to allege that he or she was a victim of a specified sex offense, when under 18 years of age, if there is independent evidence that clearly and convincingly corroborates the victim's allegation. . . .' . . . 'According to the author [Assembly Member Boland], [c]hild sexual abuse cases frequently come to the attention of law enforcement wherein the victim, now an adult reveals that they [*sic*] had been sexually abused as a child. *These cases involve specific details and are often accompanied by an admission by the perpetrator.* However, due to the statute of limitations, a case of this sort cannot be pursued in criminal court unless the crime was committed within six years of the disclosure.' " (48 Cal.App.4th at pp. 1820-1821, italics added and fn. omitted, quoting Assem. Com. on Public Safety, Analysis of Assem. Bill No. 290 (1993-1994 Reg. Sess.) p. 2.)

Yovanov asserts this passage demonstrates the Legislature intended section 803(g) to apply only in cases where the perpetrator admits his misconduct. However, while the passage states molestation cases commonly involve an admission of wrongdoing, it does not set forth any minimal criteria in terms of the quality or quantity of evidence which is required to meet the clear and convincing standard. Thus, the fact sex crime perpetrators sometimes confess their culpability does not mean a confession is needed to invoke section 803(g).

Of course, this begs the question of what evidence will suffice under the statute. As to this point, Yovanov baldly asserts, "Evidence of other conduct, such as uncharged acts with another person, cannot corroborate the claimed sexual abuse." We reject this assertion.

"Evidence of a prior sexual offense is indisputably relevant in a prosecution for another sexual offense." (*People* v. *Fitch* (1997) 55 Cal.App.4th 172, 179 [63 Cal.Rptr.2d 753].) In fact, it is precisely because such evidence is so highly probative that traditionally it has been subject to exclusion as improper character evidence in criminal trials. (*Ibid.*) Recently, however, the "Legislature has determined that the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence. The Legislature has determined the need for this evidence is 'critical' given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial. . . ." (*Id.* at pp. 181-182, citation and fn. omitted; see also *People* v. *Soto* (1998) 64 Cal.App.4th 966, 989 [75 Cal.Rptr.2d 605] [evidence of uncharged sexual misconduct has "unique probative value" in sexual assault trials].)

Accordingly, when a defendant is charged with a sexual offense, evidence of his or her uncharged sexual misconduct is no longer subject to the general prohibition against character evidence. (Evid. Code, § 1108.)[4] "With the enactment of [Evidence Code] section 1108, the Legislature 'declared that the willingness to commit a sexual offense is not common to most individuals; thus, evidence of any prior sexual offenses is particularly probative and necessary for determining the credibility of the witness.' . . ." (*People* v. *Soto, supra,* 64 Cal.App.4th at p. 983, citation omitted.)[5]

Given the significant probative value of uncharged sexual misconduct in sex crimes cases, we find evidence of such can be used to corroborate a victim's allegation of sexual abuse under section 803(g). Of course, the precise probative value to be accorded this evidence will depend on various considerations, such as the frequency of the uncharged acts and their similarity and temporal proximity to the charged acts. (*People* v. *Soto, supra,* 64 Cal.App.4th at pp. 989-990.)

Here, the uncharged sex acts were very much like the charged acts of molestation, and Kristy was a victim in both categories of misconduct. The uncharged sex acts were also close in time insofar as they led up to and continued after the charged offenses. The sheer frequency of the uncharged acts also bolsters their relevance because it suggests a pattern of criminal behavior. In short, the evidence of uncharged sexual misconduct was highly probative and corroborative of Kristy's allegations regarding the charged offenses.

That being said, we need not decide whether the evidence of Yovanov's uncharged sexual misconduct, standing alone, would constitute clear and convincing corroborative evidence, because there were other independent facts supporting Kristy's claims. For instance, Yovanov demonstrated he was utterly unable to stay away from the girls anytime he was not in prison. In fact, he even flouted his parole conditions to be alone with them. This gave Yovanov unrestricted access to Kristy, particularly in the morning after Terry left for work. Also, at the apartment he was renting, Yovanov had pornographic magazines containing articles about fathers having sex with

---

[4]Evidence Code section 1108, subdivision (a) provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." The constitutionality of this section was upheld in *People* v. *Fitch, supra,* 55 Cal.App.4th 172.

[5]Evidence Code section 1108 is patterned after the Federal Rules of Evidence, which are designed to allow the courts to liberally allow evidence of uncharged sexual misconduct in sex cases. (See *People* v. *Soto, supra,* 64 Cal.App.4th at pp. 986-990 [discussing rules 413 through 415 of the Federal Rules of Evidence (28 United States Code)].)

their daughters, which reflected Yovanov's continuing interest in deviant sexual activity. Adding these facts to the evidence of Yovanov's uncharged sexual misconduct, we believe there was clear and convincing corroborative evidence of Kristy's allegations. Therefore, the requirements of section 803(g) were met.

## III

## EVIDENTIARY ISSUES

A. *Uncharged Sexual Misconduct*— ▮▮▮ In addition to arguing his uncharged sexual misconduct should not be considered for statute of limitations purposes, Yovanov also claims it should not have been used to prove his guilt. The trial court rejected this claim, finding "the prior acts of misconduct . . . happen to be identical to the charges being made in this particular case, and show the defendant's propensity of this conduct towards this specific victim (Kristy) and also in this particular environment." We uphold the trial court's ruling.

As explained above, evidence of uncharged misconduct is generally admissible only for the purpose of proving some fact other than the defendant's disposition to commit criminal conduct. (Evid. Code, § 1101.)[6] However, "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).) In enacting Evidence Code section 1108, the Legislature decided evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of Evidence Code section 1101. (*People* v. *Soto, supra,* 64 Cal.App.4th at pp. 982-990; *People* v. *Fitch, supra,* 55 Cal.App.4th at pp. 181-183.) The only restrictions

---

[6]Evidence Code section 1101 provides in pertinent part, "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such act."

on the admissibility of such evidence are those contained in Evidence Code section 352. (64 Cal.App.4th at pp. 982-990; 55 Cal.App.4th at pp. 181-183.)[7]

Under Evidence Code section 352, the trial court has discretion to exclude evidence ". . . if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." ■ The trial court's exercise of discretion in admitting evidence under Evidence Code section 352 will not be disturbed unless the court acted in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1124 [36 Cal.Rptr.2d 235, 885 P.2d 1]; see generally, *People* v. *Harris* (1998) 60 Cal.App.4th 727, 736-737 [70 Cal.Rptr.2d 689] [Evidence Code section 352 is designed to ensure the defendant a fair trial].)

■ Yovanov insists evidence of his uncharged sexual misconduct was substantially more prejudicial than probative because the evidence was highly inflammatory. However, the evidence concerning the charged offenses was equally graphic. (See *People* v. *Ewoldt, supra*, 7 Cal.4th at p. 405.) And, because the jury knew Yovanov had already been convicted of many of the uncharged acts, it would be disinclined to hold them against him in this trial. (*Ibid.*) In addition, the uncharged acts had great probative value, given their close resemblance and temporal proximity to the charged crimes. (*Id.* at p. 404.) We therefore find no abuse of discretion in admitting the evidence of Yovanov's uncharged sexual misconduct. (*Id.* at pp. 404-405; *People* v. *Soto, supra*, 64 Cal.App.4th at pp. 990-992 [Evidence Code section 352 did not bar evidence of uncharged sexual misconduct although uncharged acts occurred several years before and involved conduct dissimilar to charged offenses]; see also *People* v. *Fitch, supra*, 55 Cal.App.4th at pp. 178-184 [admission of uncharged sexual misconduct evidence does not violate due process].)

B. *CSAAS Evidence*— ■ Yovanov concedes Dr. Thomas's testimony regarding CSAAS was probative in explaining Kristy's six-year delay

---

[7]It is immaterial Evidence Code section 1108 was enacted after the date on which Yovanov's crimes allegedly occurred because the statute became effective before Yovanov's trial. (Evid. Code, § 12; *People* v. *Fitch, supra*, 55 Cal.App.4th at pp. 185-186.) The parties assumed Evidence Code section 1108 applied in this case, and the court cited the statute in ruling on the admissibility of the prior acts evidence. However, even applying a traditional Evidence Code section 1101 analysis, we would still find the evidence admissible to show Yovanov had a common design or plan to molest Kristy. (See *People* v. *Ewoldt* (1994) 7 Cal.4th 380, 403 [27 Cal.Rptr.2d 646, 867 P.2d 757] [evidence of uncharged criminal acts that are similar to the charged offense may be relevant if they circumstantially show the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts; the plan need not be unusual or distinctive to support the inference defendant used that plan in committing the charged offenses].)

in reporting the abuse to the police. (See *People* v. *McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 [283 Cal.Rptr. 382, 812 P.2d 563]; *People* v. *Stark* (1989) 213 Cal.App.3d 107, 115-117 [261 Cal.Rptr. 479].) But he maintains the evidence was unduly prejudicial because the jury was not timely admonished it was precluded from considering the evidence for the purpose of corroborating Kristy's allegations under section 803(g).[8] Although the court so admonished the jury in its concluding instructions, Yovanov argues the instruction should have also been given at the time of Dr. Thomas's testimony.

Yovanov's argument ignores a fundamental premise of the jury system, i.e., jurors are intelligent people who are capable of understanding and following the court's instructions. (*People* v. *Laws* (1993) 12 Cal.App.4th 786, 796 [15 Cal.Rptr.2d 668].) There is no indication the jury had any difficulty applying the subject instruction, and withholding it until the end of trial was sensible because it related to the manner in which the jury was supposed to conduct its deliberations. As explained in *People* v. *Dennis* (1998) 17 Cal.4th 468, 533-534 [71 Cal.Rptr.2d 680, 950 P.2d 1035], the trial court has broad discretion when to give limiting instructions. "Thus, the trial court is not obliged to give limiting instructions the moment they are requested or when the limited evidence is presented; subsequent instruction can be sufficient in a proper case." (*Id.* at p. 534.) This was a proper case for subsequent instruction. No abuse of discretion occurred.

## IV

### PROSECUTORIAL MISCONDUCT

Yovanov alleges the trial court should have granted his motion for a mistrial based on prosecutorial misconduct. As no misconduct occurred, the motion was properly denied.

Yovanov first takes issue with the prosecutor's statements urging the jury to consider Yovanov's uncharged sexual misconduct as corroborative evidence of Kristy's allegations under section 803(g). However, as explained in part II.C. *ante*, evidence of Yovanov's uncharged sexual misconduct *was* admissible for this purpose. Therefore, the prosecutor did not misstate the law.

The prosecutor also argued, "Why did [Yovanov] violate parole? Because of his urge. He couldn't help himself. That's why he started in (molesting

---

[8]Under section 803(g), corroboration of the victim's allegations cannot come from the opinions of mental health professionals.

the twins) as soon as he did." Claiming there was no evidence he had an uncontrollable urge to molest, Yovanov submits this argument misstated the record. He forgets the prosecutor has wide latitude in closing argument to draw reasonable deductions from the evidence. (*People* v. *Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673] [prosecutor may vigorously argue the case and even use "appropriate epithets"].) While there was no direct evidence Yovanov had a predatory predilection, it strongly suggested as much. We therefore reject his claim the prosecutor distorted the record.[9]

The judgment is affirmed.

Sills, P. J., and Wallin, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 14, 1999.

---

[9]Having also rejected Yovanov's previously discussed contentions, we necessarily reject his claim cumulative error deprived him of due process.